# FILED UNDER SEAL

# EXHIBIT G

**ROTHY'S, INC. vs BIRDIES, INC.**

```
                    Confidential - Attorneys' Eyes Only
 1        IN THE UNITED STATES DISTRICT COURT
       FOR THE NORTHERN DISTRICT OF CALIFORNIA
 2               SAN FRANCISCO DIVISION

 3
     ROTHY'S, INC.,                   §
 4                                    §  CIVIL ACTION FILE NO.
                                      §  3:21-cv-02438-VC
 5             Plaintiff,             §
                                      §
 6        vs.                         §
                                      §
 7                                    §
                                      §
 8    BIRDIES, INC.,                  §
                                      §
 9                                    §
                                      §
10                                    §
             Defendant.               §
11                                    §
      ~~~~~~~~~~~~~~~~~~~~~~~~~~

12
                    VIDEOTAPED DEPOSITION OF
13                       BIANCA GATES
                      CONDUCTED REMOTELY
14

15
                     9:05 a.m. PST
16        Friday, the 11th day of February 2022

17

18

19

20     Blanche J. Dugas, CRR, RPR, CCR No. B-2290

21

22

23

24

25
```

**ROTHY'S, INC. vs BIRDIES, INC.**

Attorneys Eyes Only · Bianca Gates on 02/11/2022 · Pages 2..5

**Page 2**

```
 1            APPEARANCES OF COUNSEL
 2   On Behalf of the Plaintiff:
        STEVEN D. MOORE, Esquire
 3      Kilpatrick Townsend & Stockton, LLP
        Suite 1900
 4      Two Embarcadero Center
        San Francisco, California  94111
 5      (415) 273-4741
        (415) 651-8510 (facsimile)
 6      smoore@kilpatricktownsend.com
 7      KASEY E. KOBALLA, Esquire
        Kilpatrick Townsend & Stockton, LLP
 8      Suite 1400
        4208 Six Forks Road
 9      Raleigh, North Carolina  27609
        (202) 639-4713
10      kkoballa@kilpatricktownsend.com
11   On Behalf of the Defendant:
        DAVID TELLEKSON, Esquire
12      JESSICA KAEMPF, Esquire
        Fenwick & West, LLP
13      10th Floor
        1191 Second Avenue
14      Seattle, Washington  98101
        (206) 389-4550
15      dtellekson@fenwick.com
        jkaempf@fenwick.com
16
     Also Present:
17   James Downie, videographer
     Susie Moore
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1            INDEX OF EXAMINATION
 2   EXAMINATION                        PAGE
 3   EXAMINATION                          9
     BY MR. MOORE
 4
 5                 - - -
 6            INDEX TO EXHIBITS
 7   EXHIBIT  DESCRIPTION               PAGE
 8    37    LinkedIn profile            14
 9    38    Instagram post from Stubbs  41
            & Wootton
10
      39    Facebook post by Artemis    45
11          Design Co.
12    40    Skechers USA line sheet     48
13    41    JS Shoes product            51
            introduction web page,
14          Bates-stamped
            BIRDIES_00000622 through
15          634
16    42    Skechers USA Line Sheet,    57
            Bates-stamped
17          SKECHERS_00000003 through 6
18    43    E-mail string, Subject:     63
            Great seeing you this
19          weekend - let's catch up
            soon!, Bates-stamped
20          ROTHYS0002792 & 2793
21    44    E-mail string, Subject: A   64
            shipment from order #3904
22          is on the way,
            Bates-stamped
23          BIRDIES_00066037 & 66038
24
25
```

**Page 4**

```
 1    45    E-mail string, Subject: A   71
            shipment from order #3904
 2          is on the way,
            Bates-stamped
 3          BIRDIES_00066039 & 66040
 4    46    E-mail from Bianca Gates to 72
            Roth Martin dated Sunday,
 5          7/16/2017, Subject:
            Catching up this week!
 6          Bates-stamped
            BIRDIES_00066127
 7
      47    E-mail from Bianca Gates to 74
 8          Roth Martin dated Sunday,
            7/22/2019, Subject: Forbes
 9          article, Bates-stamped
            BIRDIES_00068457
10
      48    E-mail string, Subject:     76
11          Allbirds purpose - as per
            their VP/CMO Marketing |
12          more mission thinking
            below, Bates-stamped
13          BIRDIES_00067835 through
            67837
14
      49    Internal Birdies messages,  84
15          Bates-stamped
            BIRDIES_00061325
16
17    50    Internal Birdies messages,  84
            Bates-stamped
18          BIRDIES_00061334
19    51    Photograph of leopard       87
            sneakers
20
      52    Cloud Slack messages,       96
21          Bates-stamped
            BIRDIES_00077451 through
22          77453
23    53    Internal Birdies messages,  101
            Bates-stamped
24          BIRDIES_00061352
25
```

**Page 5**

```
 1    54    Cloud Slack messages,       101
            Bates-stamped
 2          BIRDIES_00077248 through
            77251
 3
      56    Internal Birdies messages,  127
 4          Bates-stamped
            BIRDIES_00061343
 5
      57    Cloud Slack messages,       129
 6          Bates-stamped
            BIRDIES_00077289 through
 7          77294
 8    59    E-mail string, Subject: New 134
            Rothy's shoes,
 9          Bates-stamped
            BIRDIES_0069908 and 69909
10
11    60    E-mail string, Subject: One 134
            more comment, Bates-stamped
12          BIRDIES_00069910 and 69911
13
      61    E-mail string, Subject: New 134
14          Rothy's shoes,
            Bates-stamped
15          BIRDIES_00069914 and 69915
16    62    Cloud Slack messages,       152
            Bates-stamped
17          BIRDIES_00077219 through
            77221
18
      63    E-mail string, Subject:     159
19          Slippers but better,
            Bates-stamped
20          BIRDIES_00069980 through
            69988
21
      64    E-mail string, Subject:     162
22          Slippers but better,
            Bates-stamped
23          BIRDIES_00069994 through
            70003
24
25
```

**ROTHY'S, INC. vs BIRDIES, INC.**

| Attorneys Eyes Only | Bianca Gates on 02/11/2022 | Pages 6..9 |
|---|---|---|

**Page 6**

| 1 | 65 | Internal Birdies messages, Bates-stamped BIRDIES_00061342 | 165 |
| 3 | 66 | E-mail from Marisa Sharkey to Bianca Gates, Subject: Check out Rothy's, Bates-stamped BIRDIES_0006521 | 168 |
| 6 | 67 | E-mail string, Subject: Rothy shoes in OK magazine for Mother's Day, Bates-stamped BIRDIES_00065827 and 65828 | 169 |
| 9 | 68 | E-mail from Bianca Gates to Marisa Sharkey dated Tuesday, 6/7/2016, Subject: Project update, Bates-stamped BIRDIES_00065829 and 65830 | 171 |
| 13 | 69 | E-mail string, Subject: Quick intro, Bates-stamped BIRDIES_00071625 and 71626 | 173 |
| 15 | 70 | E-mail string, Subject: Rothys photos, Bates-stamped BIRDIES_00066581 and 66582 | 177 |
| 17 | 71 | E-mail string, Subject: Rothys...some weekend baseball sideline information-gathering, Bates-stamped BIRDIES_00066626 and 66627 | 179 |
| 21 | 72 | E-mail string regarding Rothys to hit $140M this year, Bates-stamped BIRDIES_00067885 | 186 |

**Page 7**

| 1 | 73 | E-mail from Kimberly Wheeler dated Tuesday 7/23/2019, Subject: WOM Program for Birdies, Bates-stamped BIRDIES_00068459 | 189 |
| 4 | 74 | E-mail string, Subject: IG stories to repost this week, Bates-stamped BIRDIES_00068803 through 68808 | 191 |
| 7 | 75 | E-mail string, Subject: Correspondence from Michelle Mancino Marsh, Bates-stamped BIRDIES_0069960 | 194 |
| 10 | 76 | Letter dated March 9, 2021 to Birdies, Inc. From Michelle Mancino Marsh, Bates-stamped BIRDIES_00069961 through 69964 | 197 |
| 14 | 77 | E-mail string, Subject: Rothys photos, Bates-stamped BIRDIES_00066574 through 66580 | 200 |
| 17 | 78 | Cloud Slack messages, Bates-stamped BIRDIES_00076857 through 76879 | 201 |
| 19 | 79 | Instagram posts | 210 |
| 20 | 80 | Cloud Slack messages, Bates-stamped BIRDIES_00077204 through 77207 | 210 |
| 23 | 81-1 | JPEG files | 231 |
| 23 | 81-2 | JPEG files | 231 |
| 24 | 82 | JPEG file | 234 |

**Page 8**

1  83     JPEG file                                    235
2

3              (Original Exhibits 37 through 83 have
been attached to the original transcript.)

**Page 9**

1               Videotaped Deposition of Bianca Gates
                        February 11, 2022

3        VIDEOGRAPHER:  This is the beginning
4    of Media 1 in the deposition of Bianca
5    Gates in the matter of Rothy's,
6    Incorporated versus Birdies, Incorporated.
7    Today's date is February 11, 2022.  The
8    time is 9:05 a.m.
9        Will the attorneys present please
10   introduce themselves for the record, after
11   which the court reporter will swear the
12   witness.
13       MR. MOORE:  Good morning.  This is
14   Steve Moore from Kilpatrick Townsend on
15   behalf of the plaintiff, Rothy's.
16       MR. TELLEKSON:  David Tellekson with
17   Fenwick & West on behalf of Birdies.
18       (Counsel for all parties stipulate
19   that the Court Reporter is authorized to
20   swear the witness remotely.)
21              BIANCA GATES,
22   having been first duly sworn, was examined and
23   testified as follows:
24   EXAMINATION
25   BY MR. MOORE:

Page 94

1  strike that.
2       Do you know whether the materials used in
3  Rothy's shoes for the upper portion of the shoe is
4  knitted?
5     A.   I -- presumably.  I mean, I couldn't say
6  specifically that is the -- what they do, but we -- I
7  reference it as a knit, but because I don't know
8  specific the names of the ways of creating that
9  design.
10    Q.   All right.  Did you have any concern about
11 approving the knit Blackbird because of your knowledge
12 of Rothy's' knit shoes?
13    A.   No.
14    Q.   Why not?
15    A.   It was our shoe.  It's our Blackbird shoe
16 that we've had since 2015, and we have used a variety
17 of materials throughout the years, and adding a new
18 material like this knit was not going to be any
19 different than what we've done from 2015.
20    Q.   Well, you -- Birdies had never used a knit
21 in The Blackbird before February of 2021; correct?
22    A.   Correct.
23    Q.   And Birdies had not used a knit for the
24 upper of any of its shoes before February of 2021;
25 correct?

Page 95

1     A.   Correct.
2     Q.   Did Birdies do anything to investigate
3  whether Rothy's owned any patents or other
4  intellectual property pertaining to Rothy's shoes?
5     A.   I can only speak behind -- on my own
6  account, and I have never done any research in that.
7  I don't believe anybody at the company has, but you'd
8  have to ask them.
9     Q.   Did Birdies do anything to ensure that it
10 did not infringe upon any patents held by Rothy's
11 before it launched the knit Blackbird?
12    A.   Again, I can only speak on my own behalf.  I
13 have -- I did not, but I don't know to what extent
14 anybody else did.  To my knowledge, they did not.
15    Q.   And you are the chief executive officer of
16 the company; correct?
17    A.   Correct.
18    Q.   And you didn't ask anybody either at Birdies
19 or externally to do anything to ensure that there was
20 no infringement of any Rothy's patents before Birdies
21 launched the knit Blackbird; correct?
22    A.   Correct.
23    Q.   All right.  There's a number of additional
24 exhibits we've added to the share folder.  If you'd
25 please turn to that.  I believe the next one up is

Page 96

1  Exhibit 52.
2       Just please let me know when you have that
3  one before you and you've had a chance to look at it.
4       And -- well, this isn't terribly lengthy.
5  It's a Slack chat transcript.  I'm happy to refer you
6  to the messages I want you to look at, but you're
7  welcome to look at the whole thing if you'd like.
8       (Plaintiff's Exhibit 52 was marked for
9       identification.)
10      MR. TELLEKSON:  Steve, which exhibit?
11 Did you say 52?
12      MR. MOORE:  That's right.
13      THE WITNESS:  Okay.
14    Q.   (By Mr. Moore)  This is a piece of a Slack
15 conversation between you and it looks like 42 other
16 participants; is that correct?
17    A.   That's what it says here.
18    Q.   Are you familiar with which particular
19 channel on the Birdies Slack platform this is?
20    A.   It doesn't say here.  I don't know which one
21 it would be.
22    Q.   Do you have a number of different channels
23 on Slack to which you are a participant?
24    A.   Oh, yeah.  Many.
25    Q.   Okay.  Does this channel include anybody who

Page 97

1  is external to Birdies?
2     A.   I'd have to go through all of the names.
3       Well, the names I'm reading here, the number
4  of participants, many of them were not around in 2018,
5  and you're referencing Slack from 2018.
6     Q.   So what does that tell you?
7     A.   I don't know where you pulled this from.  It
8  just -- it doesn't relate to -- what I'm reading here
9  on -- on Page 4 is from 2018.  But when you're asking
10 me to confirm the individuals at the company, a lot of
11 these individuals were not here then.  So I'm confused
12 as to what specifically this document is that I'm
13 looking at.
14    Q.   Ms. Gates, any Birdies document I received
15 from your counsel.  So I'm showing you what I've got.
16 As counsel knows, we have a dispute over Birdies'
17 decision to only provide portions of its Slack
18 messages.  So I'm afraid I can't answer your question.
19      But I'll ask my question again, which is:
20 Is anybody on this Slack chat external to Birdies?
21    A.   Well, Jacquie Lenart is on here, and she, as
22 I mentioned before, is our consultant.  So she's not
23 full-time employed by Birdies, but she does work with
24 Birdies.
25    Q.   Anyone else that you can see?

Page 98

1  A.   To be honest, I don't -- well, there's --
2  nobody else -- nobody seems to be external other than
3  Jacquie Lenart, but she was a paid consultant, so I
4  guess that would make her internally, but no, she's
5  not a full-time employee, but nobody external.
6     Q.   Okay.  Now, going to the last page of
7  Exhibit 52, I'll direct your attention to the last two
8  chats.  The second-to-last is from Adriana.  Do you
9  see that?
10    A.   Yes.
11    Q.   And she says, "A little hashtag Monday inspo
12 brought to you by a happy customer.  Amazing use case
13 and reinforces our brand messaging."  And then she
14 quotes the customer's remarks; correct?
15    A.   That's what I read here, yes.
16    Q.   All right.  And you respond immediately
17 below that; correct?
18    A.   Yes.
19    Q.   All right.  And you say, "Hi, OMG, love
20 this.  However, it does feel like we are overlapping
21 more and more with Rothy's' use case."
22          Do you see that?
23    A.   Yes.
24    Q.   You say, "Different styles obviously, but
25 something to keep in mind, especially if we play

Page 99

1  around with price points, et cetera"; correct?
2     A.   Yes.
3     Q.   And then you compare testing a $120 launch
4  point versus $165 for the Rothy's loafer.  Is that
5  what the last sentence says?
6     A.   Yes.
7     Q.   Why did you feel like Birdies was
8  overlapping more and more with Rothy's' use case?
9     A.   Because our brand up until that time was --
10 the use case was intended for the home, and our
11 customers were starting to wear us more and more
12 outside of the home.  And I was unsure at that time in
13 2018 whether or not we should, you know, expand as our
14 customers were asking us to expand beyond the home or
15 stay focused on just the home.  So that's what I was
16 referring to, use cases.
17    Q.   And what was Rothy's' use case at that time?
18    A.   They were marketing themselves more outside
19 of the home.
20    Q.   So what did Birdies ultimately conclude with
21 respect to whether to expand into an outdoor use case
22 for its products?
23    A.   Did you say when?
24    Q.   What.  Sorry.  What did Birdies decide to
25 do?

Page 100

1     A.   We decided to continue to expand based on
2  how our customers were wearing our shoes.
3     Q.   So in other words, Birdies started releasing
4  shoes that were more focused on outdoor use cases?
5     A.   Yes.
6     Q.   Now, you said, "Different styles obviously."
7  Are you referring to the fact that Rothy's and Birdies
8  had different styles?
9     A.   Yes.
10    Q.   So as of August 2018, you did not believe
11 that Birdies had anything of the same style as
12 Rothy's?
13          MR. TELLEKSON:  Objection, vague.
14          THE WITNESS:  Our shoe is a unique
15    shoe.  So just by that, I would define that
16    we're different.
17    Q.   (By Mr. Moore)  And in 2018, they were
18 different from anything that Rothy's had on the market
19 at that time.
20    A.   Yes.
21    Q.   All right.  Now, I understand that the knit
22 Blackbird was publicly released in February of 2021.
23 Does that sound correct?
24    A.   Yes.
25    Q.   All right.  If you'd go to the next exhibit,

Page 101

1  please, which is Exhibit 53.  I don't think I --
2          MR. MOORE:  For the record, 52 was
3     BIRDIES, three zeros, 77450 through 77453.
4          And then Exhibit 53 is BIRDIES_61352.
5          (Plaintiff's Exhibit 53 was marked for
6     identification.)
7     Q.   (By Mr. Moore)  Just please let me know when
8  you have that in front of you.
9     A.   Actually, can I get a moment to read it?
10    Q.   Please.  And actually, before that, though,
11 if you would please also pull up 77248.  This is --
12 sorry, what will be marked as Exhibit 54, which is
13 BIRDIES_77248 through 77251, and the reason is that
14 these are related.
15          But yes, please review both of those and
16 just let me know when you're -- when you're ready.
17          (Plaintiff's Exhibit 54 was marked for
18    identification.)
19          THE WITNESS:  Okay.
20    Q.   (By Mr. Moore)  All right.  Exhibit 53 is
21 another excerpt of a Slack conversation; correct?
22    A.   Yes.
23    Q.   And it's dated -- this excerpt is dated
24 February 9th, 2021.
25    A.   Yes.

Page 106

1  9:49 a.m. chat that you wanted to use for Courtney and
2  for others to consider as the right language for
3  others?
4      A.   I wrote it after I saw the comment from
5  Courtney.
6      Q.   Did you write it on your own or did you have
7  help?
8      A.   Yes.
9           No, I wrote it on my own.
10     Q.   Okay.  Sorry.  That was a bad question.  You
11 wrote it on your own.  Thank you.
12          Had you expected to receive comments like
13 Birdies did from Courtney?
14     A.   No.
15     Q.   Were you surprised to receive comments like
16 that?
17     A.   We receive so many comments with people, you
18 know, saying a variety of things, nothing surprises me
19 anymore.
20     Q.   Do you typically -- do you as the CEO
21 typically write the responses that you want others to
22 use in response to other comments other than this one
23 instance?
24     A.   Yes.
25     Q.   What other times have you done that?

Page 107

1      A.   Our customer service team and our social
2  media team are not in the merchandising and product
3  meetings.  So as questions will come up with a shoe,
4  we have to arm them with, you know, how did we make
5  it, what's in it, where do we ship from, where --
6  from, did we design these.  I mean, every sort of
7  questions that we would -- you know, that they would
8  not have answers to unless it comes from, you know,
9  either myself, Robyn or Marisa.
10     Q.   Okay.  But my question is specifically that
11 you as CEO are involved in writing responses to be
12 used for customer comments?
13     A.   Once in a while.  You know, it depends.
14     Q.   Was this an unusual situation in which you
15 were involved in writing responses to be used to
16 customer questions, or is it something that you did
17 routinely?
18          MR. TELLEKSON:  Objection, compound,
19     vague and ambiguous.
20          THE WITNESS:  The social media person
21     reports directly in to me.  And so we work
22     through these together.  So it just -- it
23     really depends on, you know, if these are
24     similar questions that we've been getting
25     for a long time, you know, she will

Page 108

1      respond.  If it's a new question that, you
2      know, we hadn't heard, then we will craft
3      it together.
4      Q.   (By Mr. Moore)  Who was the social media
5  person at this time?
6      A.   Who?
7      Q.   Yes.  Who?
8      A.   Emily Longley.
9      Q.   Okay.  Were you concerned that consumers
10 were commenting on the knit Blackbird being so similar
11 to Rothy's?
12     A.   I wanted to make sure that customers had the
13 accurate, right information.  You know, it's not a
14 pleasant thing to read, but, you know, I wasn't
15 concerned.
16     Q.   If you could look, please, at Exhibit 54.
17 Have you already reviewed it or you need a few
18 moments?
19     A.   You can just point me to where you need me
20 to review.
21     Q.   Okay.  This is an excerpt of a Slack
22 conversation between you and Ms. Longley, the social
23 media coordinator; is that correct?
24     A.   I don't remember a specific title, but she
25 was managing social media.

Page 109

1      Q.   All right.  And this is Ms. Longley, though;
2  correct?  The Emily in this chat is Ms. Longley?
3      A.   Yes.
4      Q.   Now, do you see at the bottom of Page 2 that
5  there is a gap in time between 1:26:07 a.m. for your
6  message which reads, "Same.  Thanks Emily," and on the
7  top of the next page, 5:28:20 p.m.?
8      A.   Yes, I -- yes.
9      Q.   Were there messages --
10     A.   I don't know -- go ahead.
11     Q.   Go ahead.
12          Were there messages exchanged between the
13 two of you between 1:26:07 a.m. and 5:28:20 p.m.?
14     A.   I don't know.
15     Q.   Do you know what time zone the timestamp --
16     A.   That's what I was going to ask.  I don't --
17 I don't know.
18     Q.   All right.
19          MR. MOORE:  Counsel, we would ask for
20     a full copy of this Slack chat because
21     there are messages missing, and we think
22     it's highly relevant.  So we would ask for
23     that during the deposition, otherwise,
24     we'll have to hold it open.
25          MR. TELLEKSON:  I don't agree with

**ROTHY'S, INC. vs BIRDIES, INC.**

Page 110

1   your characterization.
2          MR. MOORE:  Well, that's no surprise.
3   Regardless, we're asking for the document
4   to be provided today while we're still
5   here.
6      Q.   (By Mr. Moore)  All right.  Well, on that
7   third page of Exhibit 54, you say -- I don't know who
8   says.  Somebody says at the top there, "Hi.  I think
9   these are Birdies."  And you say, "Would you mind
10  commenting something nice" -- "nice back to her post
11  from Birdies."
12          Do you see that?
13     A.   Yes.
14     Q.   And then Emily says, "Of course.  One
15  moment."  And then I think that is an icon or an
16  emoji, slightly smiling face.  "Responding to many
17  comments, hah hah."
18          Do you see that?
19     A.   Yes.
20     Q.   And then two more down, Emily asks -- Ms.
21  Longley asked, "Hi Bianca.  Is the following an
22  appropriate way to address comments comparing us to
23  Rothy's?  I tried to base it off your message in the
24  social channel." And then the next message down is a
25  hyperlink to files.slack.com.  Do you see that?

Page 111

1      A.   Yes.
2      Q.   Is that an image or a screenshot that she
3   sent you?
4      A.   I don't know what that is, but presumably.
5      Q.   All right.
6          MR. MOORE:  Well, Counsel, again, we
7   would request and we have requested a
8   number of times now to be provided the
9   native Slack that include images.  So I
10  would ask you provide that today as well so
11  I can question this witness about it.
12          Do you agree?
13          MR. TELLEKSON:  I'm not going to
14  respond on the fly.  We -- we've -- a
15  record of these discussions is copious.  So
16  I don't have anything to add right now.
17          MR. MOORE:  All right.  Well, we will
18  hold the deposition open if we're not able
19  to question this witness about it.
20     Q.   (By Mr. Moore)  All right.  In any event,
21  the next response down, Ms. Gates, you say, "Thanks.
22  I'd reword it a bit.  I'd say," and then you include
23  your quote, proposed response; correct?
24     A.   Yes.
25     Q.   And then further down a few more messages at

Page 112

1   5:54:48 p.m., you say, "Hi, just saw you responded to
2   kelseizetheday with the previous response.  Can you
3   please delete and update with the new response"; is
4   that right?
5      A.   Yes.
6      Q.   Okay.  And do you know who kelseizetheday
7   is?
8      A.   No.
9      Q.   If we go over to the next page -- oh --
10  strike that.
11          What you're asking Ms. Longley to do is
12  instead of using the previous language to respond to
13  this commenter, kelseizetheday, you instead are asking
14  her to use the revised language that you provided
15  above; correct?
16     A.   I don't know specifically, but the
17  initial -- the initial response I gave was
18  specifically to Courtney, and kelseizetheday is likely
19  a different account.  And so we were not going to
20  verbatim say, "Courtney, thank you."  So we had to
21  update it to respond to kelseizetheday.
22     Q.   Do you know what other changes you made
23  besides just removing the name Courtney?
24     A.   I don't know.
25     Q.   All right.  On the next page, a few more

Page 113

1   exchanges down, you wrote, at a timestamp of
2   6:26:01 p.m., "Hi, I think this needs to be edited.
3   Do you know if she's a customer?  If not, I'd remove
4   the first line.  That line was for the other person
5   who said she's a customer," and then you include what
6   appears to be a link to an image; correct?
7      A.   Correct.
8      Q.   And so are you asking Ms. Longley to revise
9   another response to a customer comment?
10     A.   Again, I don't know if this is a customer.
11  In the initial response I gave, it says, "Courtney,
12  thank you for being a valued customer."  So we cannot
13  be using that language if we don't know if, in fact,
14  this person is a customer.  So I'm asking her if
15  she -- if this person is a customer or not.
16     Q.   And you are giving suggestions for how to
17  edit the response if the person is not a customer;
18  correct?
19     A.   Well, we would not say, "Thank you for being
20  a valued customer" if she's not a customer, so yes.
21     Q.   All right.  And do you know what image you
22  sent at 6:26:08 p.m.?
23     A.   I don't.
24     Q.   Do you know if -- well, strike that.
25          All right.  And then a few more chats down,

Page 118

1  2.0 that is included in Exhibit 53, which is your
2  Slack message; correct?
3      A.   Yes.
4      Q.   And so -- and you're welcome to compare the
5  wording to confirm it, but the response that Birdies
6  provided to Courtney Woodard Lewis is the same
7  language that you wrote in Exhibit 53 that you wanted
8  to be used; correct?
9      A.   Yes.
10     Q.   Now, do you see that the previous two
11  responses also have responses from Birdies' customer
12  service?
13     A.   Yes.
14     Q.   Did you write the language to be used in
15  either of those responses?
16     A.   This is pre-existing responses, language.  I
17  wouldn't have had to write this because this was
18  already written a long time ago.
19     Q.   But on the day of the knit Blackbird launch,
20  you had to write language to be used to respond to
21  consumers like Courtney who called the knit Blackbird
22  Rothy's 2.0; correct?
23     A.   Yes.
24     Q.   Do you see that her comment has five
25  reactions, including at least one like and at least

Page 119

1  one laughing face?
2      A.   Yes.
3      Q.   Now, if you scroll down to the next comment,
4  do you see that it's from a Facebook username Chen
5  Marie?
6      A.   Yes.
7      Q.   And Chen Marie writes, "I love this brand,
8  but I feel like this is just like Rothy's"; correct?
9      A.   Yes.
10     Q.   So two comments in a row on this Facebook
11  post say that the knit Blackbird looks like Rothy's
12  shoes; correct?
13     A.   Correct.
14     Q.   And Birdies provides a response to this as
15  well.  Do you see that?
16     A.   Yes.  Yes.
17     Q.   Is that language that you wrote as well?
18     A.   I don't recall if I wrote this or not.
19     Q.   If you could go down a few more comments to
20  an individual named Lisa Ann Wood Johnson.  Do you see
21  that?
22     A.   Yes.
23     Q.   And she writes, "Hmm copying another popular
24  shoe brand I see," along with an emoji that looks like
25  somebody scratching their chin; correct?

Page 120

1      A.   Yes.
2      Q.   And you understand by that, of course, that
3  she's referring to Rothy's?
4      A.   I don't know what she was referring to.
5      Q.   Well, I mean, it would have to be Rothy's;
6  right?
7           MR. TELLEKSON:  Objection, asked and
8       answered.
9           THE WITNESS:  I don't know.
10          MR. TELLEKSON:  Calls for speculation.
11     Q.   (By Mr. Moore)  So your testimony is it
12  could be someone besides Rothy's?
13     A.   My testimony is I don't know this person or
14  what she was referring to when she was commenting.
15     Q.   Did anyone -- well, strike that.
16          When the knit Blackbird was released, of all
17  the customer service and social media comments, did
18  anyone say that the knit Blackbird looked like any
19  other type of shoe besides Rothy's?
20     A.   No.
21     Q.   Did you write the language used to respond
22  to Lisa Ann Wood Johnson as well?
23     A.   I don't recall.
24     Q.   If you could please look next at Exhibit 23,
25  which is probably further up on the folder, and just

Page 121

1  let me know when you've had a chance to look at that.
2      A.   Okay.
3      Q.   All right.  Now, this is an Instagram post
4  by Birdies concerning the knit Blackbird shoe;
5  correct?
6      A.   Yes.
7      Q.   And there are also a number of comments that
8  Instagram users have made to this post as well; is
9  that right?
10     A.   Yes.  I see 1,737 likes and a lot of
11  positive comments here.  Yes.
12     Q.   You said you see a lot of positive comments?
13     A.   I do.
14     Q.   And you also see some negative comments too;
15  right?
16     A.   I'm still scrolling, so I'll -- I don't see
17  any yet.
18     Q.   Okay.  Well, I'm happy -- again, you're
19  always welcome to read what you'd like to read, but
20  I'm happy to point you to what I'd like to ask you
21  about if that would be --
22     A.   Yes, that would be great.
23     Q.   All right.  If you could go, please, to the
24  page at the bottom right that says ROTHYS2702.
25     A.   At the bottom right.  When you say the

Page 126

1  right?
2      A.   Yes.  Our response got four likes.
3           MR. MOORE:  Once again, motion to
4      strike, nonresponsive.
5      Q.   (By Mr. Moore)  Ms. Gates, kelseizetheday's
6  comments got 11 likes; correct?
7      A.   Yes.
8      Q.   And lyss_789's reply to that comment got
9  four likes; right?
10     A.   Yes.
11     Q.   Do you still have Exhibit 54 before you,
12 which is the Slack chat?
13     A.   No, but I can pull it up.
14          Okay.
15     Q.   Do you see at the very first page there
16 where it says, "Case time zone (UTC) Coordinated
17 Universal Time"?
18     A.   Yes.
19     Q.   All right.  So that tells us that the time
20 zone of the timestamp is UTC; correct?
21     A.   Yes.
22          MR. MOORE:  Okay.  I've got a few more
23     exhibits, but what is your preference,
24     David, in terms of our timing?  Would you
25     like me to continue or take our lunch

Page 127

1  break?
2           MR. TELLEKSON:  How about another
3      five, ten minutes?
4           THE WITNESS:  Sure.
5           MR. MOORE:  Y'all want to break at
6      1:00?
7           MR. TELLEKSON:  Sure.
8           MR. MOORE:  Let's do that.
9      Q.   (By Mr. Moore)  All right.  If you could,
10 then, please go next to -- let's see.  I wrote one
11 off.  That means I have moved.  I think we can skip
12 55.  Let's -- if you could please pull up 56.
13          Hang on.  While you're doing that, please
14 pull up Exhibit 56, which is BIRDIES_00061343.  Let me
15 know when you've had a chance to take a look.  And
16 I'll be right back.
17          (Plaintiff's Exhibit 56 was marked for
18     identification.)
19          THE WITNESS:  Okay.
20     Q.   (By Mr. Moore)  This Exhibit 56 is another
21 excerpt of a Slack chat within Birdies; correct?
22     A.   Correct.
23     Q.   And this is, again, on the launch day of the
24 knit Blackbird, February 9th, 2021; correct?
25     A.   Correct.

Page 128

1      Q.   It starts out with Sean making a comment.
2  And who is Sean?
3      A.   Sean is our VP of finance.
4      Q.   And Sean -- what's his last name?
5      A.   Scanlan.
6      Q.   Mr. Scanlan says, "Instagram user
7  @rothysmommy likes these washable Blackbirds," with a
8  crying laughing face; right?
9      A.   Yes.
10     Q.   And then Patrice responds.  Who is Patrice?
11     A.   She works in customer service.
12     Q.   And was her last name?
13     A.   I -- I don't know.
14     Q.   She says, "I'm pretty sure I'm messaging her
15 now.  She's asking a lot about Rothy's and that they
16 just launched a collection too"; correct?
17     A.   Yes.
18     Q.   And then you then respond to Patrice;
19 correct?
20     A.   Yes.
21     Q.   And are you giving Patrice the same talking
22 points that you gave to Ms. Longley and others to
23 respond to consumers asking about the knit Blackbird?
24     A.   Yes.
25     Q.   And you say that you're doing this because,

Page 129

1  "I don't want people to think we are copying or going
2  after Rothy's.  We design based on feedback from
3  customers"; right?
4      A.   Yes.
5      Q.   All right.  Do you see below there,
6  there's -- well, who is Brooke Curran, who makes the
7  next comment?
8      A.   Brooke runs our special impact.
9      Q.   And she includes a link and a picture from
10 an Instagram posting; correct?
11     A.   Yes.
12     Q.   Do you know what image or link that she
13 provided there?
14     A.   No.
15          MR. MOORE:  Counsel, we'd again ask
16     for Slacks with images.  So we would like
17     today so we can ask this witness about the
18     full copy of this Slack that includes the
19     image, or we'll have to hold it open.
20     Q.   (By Mr. Moore)  All right.  Let's -- if you
21 could please pull up Exhibit 57, which is
22 BIRDIES_00077289 through 293.  Please let me know when
23 you've had a chance to review that.
24          (Plaintiff's Exhibit 57 was marked for
25     identification.)

Page 130

1    THE WITNESS:  Okay.
2    Q.   (By Mr. Moore)  This is -- or I should say
3  this exhibit, Exhibit 57, this is the -- this includes
4  the same Slack messages that we just looked at in
5  Exhibit 56; is that correct?
6    A.   I can't recall specifically, but...
7    Q.   All right.  Well, if you could look at the
8  third page -- sorry -- fourth page.  It has a number
9  in the bottom right of 77292.  Do you see the message
10  from Mr. Scanlan that refers to the Instagram user
11  rothysmommy?
12    A.   Sorry, can you point me to the page number
13  again?  I'm getting a different page number and bottom
14  right-hand number.
15    Q.   What number do you have for Exhibit 57?
16    A.   7229.
17    Q.   Oh, I have -- that's strange.  I have in the
18  file share that is 77289.
19    MR. MOORE:  Did we get them switched?
20    Okay.
21    THE WITNESS:  Oh, sorry.  Let me --
22    Q.   (By Mr. Moore)  I think that's been
23  reversed.
24    A.   Okay.  Let's go back.  I'm looking at
25  Exhibit 57; is that correct?

Page 131

1    Q.   Yes.  Why don't we -- to make this quicker,
2  why don't -- if you could please pull up 57 and 58,
3  and we'll figure out which is which, and I'll ask you
4  about both of them.
5    A.   Okay.  You know what, when I download 57, it
6  downloads at 58.
7    Q.   We used to just hand paper across the table.
8    A.   I know.
9    Okay.
10    Q.   So which one are you looking at now, Ms.
11  Gates?
12    A.   57.  It's 77289.
13    Q.   Perfect.  Sorry for that confusion, but
14  that's where I hope to be.
15    All right.  So -- and if you need more time,
16  please take it, but what I want to ask you about is on
17  Page 4.
18    A.   Okay.  Yes.
19    Q.   Are these the same messages that we looked
20  at in Exhibit 56 just a moment ago?
21    A.   They appear to be, yes.
22    Q.   All right.  And we can't tell from this
23  version of the same Slack chat what image Brooke had
24  provided?
25    A.   No.

Page 132

1    Q.   All right.  All right.  Then I think if you
2  would please look at Exhibit 58, which is BIRDIES_7 --
3  00077229 through 77237.  It's a bit lengthier Slack
4  exchange, but I will tell you -- and as always, you're
5  welcome to look at what you'd like, but I will tell
6  you I'm going to ask you only about the first page.
7    A.   Okay.
8    Q.   So just let me know when you're ready,
9  please.
10    A.   Okay.
11    Q.   This is a Slack channel including messages
12  between you and Danielle.  Please remind me who
13  Danielle is.
14    A.   Well, Danielle runs social media for us now
15  because Emily is no longer here.  But at the time, I
16  don't know what -- she might have been customer
17  service.
18    Q.   What is her last name?
19    A.   Murphy.
20    Q.   She wrote you and said, "Hi B.  I'm working
21  with Emily right now on a variety of responses for
22  negative comments, mainly about copying Rothy's";
23  correct?
24    A.   Yes.
25    Q.   And then she explained what she was doing

Page 133

1  there.  And then you responded, "Wonderful and agree.
2  Thank you D."
3    Correct?
4    A.   Yes.
5    Q.   All right.  And if I'm doing my time zone
6  conversion right, this is in the morning of the day of
7  launch of the knit Blackbird; correct?
8    A.   I don't know what UCT time is, so it's hard
9  for me to do the math.
10    Q.   Right.  All right.  Well, that can be
11  determined; right?
12    A.   Yes.
13    Q.   All right.  In any event, it was on the day
14  of launch; correct?
15    A.   Yes.
16    Q.   All right.
17    MR. MOORE:  Should we take our -- go
18  off the record and take our lunch break?
19    MR. TELLEKSON:  Yeah, that sounds
20  good.  How about 30 minutes?
21    MR. MOORE:  Sure.  Let's go off the
22  record.
23    VIDEOGRAPHER:  The time is 10 -- the
24  time is 1:03 p.m.  We're now off the
25  record.

Page 150

1    speculation, improper hypothetical.
2         THE WITNESS:  I don't know if I've
3    seen two exactly the same silhouettes.
4    Each silhouette has a slightly different
5    version than the other.  I mean, maybe.  I
6    don't know.  I know Birdies has its own
7    unique design.
8    Q.   (By Mr. Moore)  Is it possible that two
9    shoes could have generally the same silhouette and yet
10   be very different designs?
11        MR. TELLEKSON:  Objection, calls for
12   speculation, vague and ambiguous.
13        THE WITNESS:  Can you repeat the
14   question?
15        MR. MOORE:  Please read it back.
16        (The record was read by the reporter
17   as requested.)
18        THE WITNESS:  Yes.
19   Q.   (By Mr. Moore)  And the knit Blackbird is
20   not exactly the same as the calf hair Blackbird;
21   right?
22        MR. TELLEKSON:  Objection, asked and
23   answered.
24        THE WITNESS:  The Blackbird we
25   launched in 2015 is the same shoe we still

Page 151

1    call the Blackbird today.
2         MR. MOORE:  Motion to strike,
3    nonresponsive.
4    Q.   (By Mr. Moore)  The calf hair Blackbird and
5    the knit Blackbird are not exactly the same; correct?
6         MR. TELLEKSON:  Objection, asked and
7    answered.
8         THE WITNESS:  They are the same shoe,
9    different material.
10   Q.   (By Mr. Moore)  Right.  And so because they
11   have different material, they are not exactly the
12   same; right?
13   A.   That is correct.
14   Q.   The calf hair Blackbird has an upper made of
15   animal skin with hair on it; right?
16   A.   Yes.
17   Q.   And the knit Blackbird has an upper made of
18   a vegan material, so not animal skin, that is knit
19   together; right?
20   A.   Yes.
21   Q.   And the knit Blackbird does not have animal
22   hair on it; right?
23   A.   Correct.
24   Q.   Okay.  Did any other Birdies investors
25   contact you or Ms. Sharkey about the knit Blackbird

Page 152

1    release?
2    A.   I don't recall.
3    Q.   If you'd go to -- the next exhibit I'd like
4    to go to is Exhibit 5.  It's probably up towards the
5    top of the folder.
6         I'm incorrect.  I apologize.  I meant to --
7    I meant to --
8         MR. MOORE:  Could we please upload
9    Exhibit 4 instead.
10   Q.   (By Mr. Moore)  Let's go ahead to the next
11   one while that's happening.  I actually don't want to
12   ask you -- I don't think I want to ask you about
13   Exhibit 5.  So it's -- while the next one is
14   uploading, if you could please pull up Exhibit 62,
15   which is Bates number BIRDIES_00072219.
16        Please just let me know when you've had a
17   chance to look at that.  The Bates number is 72219
18   through 77221.
19        (Plaintiff's Exhibit 62 was marked for
20   identification.)
21        THE WITNESS:  Okay.
22   Q.   (By Mr. Moore)  This is excerpts from a
23   Slack chat between you and -- is it Ms. Nasser?
24   A.   Yes.
25   Q.   All right.  And it's from January of 2021;

Page 153

1    correct?
2    A.   Correct.
3    Q.   This is perhaps a couple of weeks before the
4    launch of the knit Blackbird; correct?
5    A.   Correct.
6    Q.   Okay.  And is Ms. Nasser discussing filming
7    a video of the knit Blackbird for purposes of the
8    release?
9    A.   Yes.
10   Q.   And what she says there is, "Morning.  About
11   to start filming the video after setting up and prep.
12   FYI, we won't be showing the twist of the shoe a la
13   Rothy's and" -- "a la Rothy's as after playing around,
14   this shoe doesn't actually twist like that.  I also
15   think this movement is ownable to Rothy's too.  It
16   does bend in half but this creates a deep crease that
17   can't be reversed."
18        Do you understand what she's saying there?
19   A.   Yes.
20   Q.   What is she saying?
21   A.   She's saying that -- she's planning on
22   showing how easy our shoe is to get on the foot, and
23   focus on washability.  And she's also pointing out
24   that the twisting movement is ownable to Rothy's, and
25   let's just not do that.

Page 154

1   Q.   Well, what does she mean by "the twist of
2   the shoe a la Rothy's"?
3       A.   I don't know specifically.  I was not on the
4   set and she was the creative director.  But, I mean,
5   it's clear that she's not -- she's identifying that
6   something appears more like what Rothy's would do, so
7   we're not going to do that and we're going to focus on
8   the washability of our shoe.
9       Q.   Well, isn't she saying that the knit
10  Blackbird actually doesn't twist like that?
11      A.   Correct.
12      Q.   So doesn't that suggest that she tried to
13  twist it a la Rothy's?
14      A.   She might have.  But we -- you know, again,
15  this is our shoe.  Our Blackbird.  Our Blackbird does
16  not twist.  It never has.
17      Q.   And when you say twist, what does that mean?
18      A.   I think just, you know, twisting it around.
19  But our Blackbird silhouette has always been, you
20  know, stiffer, more firm.
21      Q.   And she said -- doesn't she say that when
22  she does try to twist it a la Rothy's, it creates a
23  deep crease that can't be reversed?
24      A.   Yes.
25      Q.   Now, this Slack chat has, I think, four

Page 155

1   images or other files that are embedded in it;
2   correct?
3       A.   Yes.
4       Q.   And do you know what those are?
5       A.   I think she's just sending me some -- the
6   raw footage of the shoot.
7           MR. MOORE:  Counsel, we would ask for
8       the full copy of this Slack chat with these
9       images in them today so that we can ask
10      this witness about it, otherwise, we'll
11      hold the deposition open.
12      Q.   (By Mr. Moore)  All right.  We can move on
13  to -- I think Exhibit 4 should be available to you in
14  the folder.  If you'd please pull that up and let me
15  know when you've had a chance to look at it.
16      A.   Okay.
17      Q.   Exhibit 4, this is a TechCrunch article
18  about Birdies; correct?
19      A.   Yes.
20      Q.   And you are -- were interviewed for this
21  article?
22      A.   Correct.
23      Q.   All right.  I want to ask you about a
24  statement -- or quote that you gave on Page 2 at the
25  bottom -- towards the bottom of the page.  Do you see

Page 156

1   that you're discussing how you and Ms. Sharkey had
2   each invested your own money in the company at the
3   beginning in order to make the first batch of shoes
4   that the company sold?
5       A.   Yes.
6       Q.   And that first batch included the calf hair
7   Blackbird; correct?
8       A.   Correct.
9       Q.   All right.  And the very bottom of the page,
10  above your pictures, do you see the article says,
11  "What did they get for their money?  Shoes that today
12  give them both, quote, PTSD, jokes Gates."
13          What shoes were you talking about that gave
14  you and Ms. Sharkey PTSD?
15      A.   Just all of the back-and-forth design and
16  manufacturing of the shoes.  Our manufacturing
17  partners had a difficult time executing the first two
18  times.
19      Q.   Was that true for the calf hair Blackbird as
20  well?
21      A.   Yes.
22      Q.   All right.  And if we'd skip over to Page 4.
23  I think it's three paragraphs up from the end of the
24  article.  Do you see there's a sentence that begins,
25  "Yet the biggest hurdles to overcome"?

Page 157

1       A.   Yep.
2       Q.   And it says there, "Yet the biggest hurdle
3   to overcome may eventually involve copycats."  Then
4   there's a reference to Rothy's filing a patent
5   infringement suit against a rival.  Do you see that?
6       A.   Yes.
7       Q.   Do you know which suit that refers to?
8       A.   I do not.
9       Q.   Okay.  And then the next paragraph
10  indicates, "Asked about this, Gates doesn't seem
11  terribly concerned, not yet."  And then there's a
12  quote from you that reads, "We've had friends tell us
13  that Target is offering a similar slipper at a
14  different price point.  Everybody copies everybody,
15  she says."
16          Do you see that?
17      A.   Yes.
18      Q.   And that's a quote that you gave to
19  TechCrunch for this article?
20      A.   As part of a bigger conversation, yes.
21      Q.   All right.  And when you said "everybody
22  copies everybody," are you referring to the footwear
23  industry?
24      A.   I'm referring to -- I mean, just in general.
25  People copy people.

Page 162

1    Q.   Okay.  Well, you also said, "Game on";
2  right?
3     A.   I did.
4     Q.   What game was going to be on?
5     A.   That I was going to defend myself in that
6  the Blackbird that they were questioning is our
7  original Blackbird which predates, you know, the
8  loafer that they were referring to.
9     Q.   The calf hair, you mean.
10    A.   Correct.
11    Q.   All right.  Now I think we can go to the
12  next document, 64.  Exhibit 64 is Bates number
13  BIRDIES_00069994 through 699 -- I'm sorry -- through
14  70003.
15        (Plaintiff's Exhibit 64 was marked for
16        identification.)
17        THE WITNESS:  Okay.
18    Q.   (By Mr. Moore)  This is a series of e-mails
19  between you and a few other people at Birdies.  This
20  also begins with a forwarded Rothy's ad; correct?
21    A.   I believe this is the same ad that Priti had
22  sent to me.
23    Q.   Right.  And you responded to the e-mail by
24  saying, "Copying our marketing since 2016"; right?
25    A.   Yes.

Page 163

1     Q.   And you meant there that Rothy's had been
2  copying Birdies's marketing since 2016?
3     A.   Yes.
4     Q.   Other than the word "slippers," what else
5  had -- in your view, had Rothy's done to copy Birdies'
6  marketing since that time?
7     A.   As it says here in the reference to
8  cloud-like comfort.
9     Q.   Is that Birdies had used the phrase
10  "cloud-like comfort"?
11    A.   Yes.
12    Q.   That precise phrase?
13    A.   Yes.
14    Q.   Okay.  Did Birdies have any protectable
15  rights in that phrase?
16    A.   No.
17    Q.   Any other aspects of Birdies' marketing that
18  you felt that Rothy's had copied since 2016?
19    A.   I don't recall.
20    Q.   The very top, you -- after some further
21  responses internally, you say, "The irony of it all is
22  unbelievable."  What did you mean there?
23    A.   That they're suing us because they're
24  claiming that we copied them, which we did not, and,
25  you know, here they are using messaging that we

Page 164

1  were -- we had already been using.
2     Q.   But you understand that Rothy's has
3  protectable rights in the design patents that it is
4  asserting in this case; right?
5     A.   Yes.
6        MR. TELLEKSON:  Objection, assumes a
7        fact not in evidence.
8     Q.   (By Mr. Moore)  I understand you don't agree
9  with the claim, but I'm just asking if you understand
10  that Rothy's actually has received design patents from
11  the United States Government, and that's what's the
12  claims it's asserting in this case; correct?
13    A.   Correct.
14    Q.   Now, do you also understand that even if
15  Birdies didn't copy or didn't intend to copy Rothy's,
16  that it can nonetheless be found to infringe Rothy's'
17  patents?
18        MR. TELLEKSON:  Objection, calls for a
19        legal conclusion, calls for speculation.
20        THE WITNESS:  Yeah, I'm not a lawyer.
21        I don't know.  All I can tell you is that
22        our shoe predates theirs, and we have had
23        the same shoe since 2015.
24    Q.   (By Mr. Moore)  I'm not asking you to give
25  legal advice, Ms. Gates.  I'm just asking if you have

Page 165

1  an understanding that --
2     A.   You're asking me about legal -- legal stuff.
3  I can't tell you.
4     Q.   Let me finish my question, please.
5        I'm just asking if you have an understanding
6  that even if Birdies didn't intend to copy Rothy's,
7  there nonetheless could be a finding by a jury of
8  patent infringement in this case?
9        MR. TELLEKSON:  Same objection.
10    Q.   (By Mr. Moore)  Do you have that
11  understanding?
12    A.   Yes.
13    Q.   Okay.  All right.  Let's -- you may need to
14  refresh because we may have tweaked some of the
15  exhibits, but if you could please refresh, I'd like to
16  go to the next exhibit, which is 65.  And that is a
17  document Bates-numbered BIRDIES_00061342.
18        Please just let me know when you've got it
19  and have taken a look.
20        (Plaintiff's Exhibit 65 was marked for
21        identification.)
22        THE WITNESS:  I have it.
23    Q.   (By Mr. Moore)  Okay.  This is another
24  excerpt of a Slack conversation within Birdies;
25  correct?

ROTHY'S, INC. vs BIRDIES, INC.
**Attorneys Eyes Only** — **Bianca Gates on 02/11/2022** — **Pages 166..169**

Page 166

1   A.   Yes.
2   Q.   And it starts with an individual named Megan
3   Steele saying, "I saw this and literally thought it
4   was us." Who is Megan Steele?
5   A.   She runs our store.
6   Q.   And what is she referring to?
7   A.   I -- I don't know.
8   Q.   We don't know because your counsel hasn't
9   provided us the full chat; right?
10       MR. TELLEKSON:   Objection,
11   argumentative, incorrect.
12       MR. MOORE:   Well, Counsel, I'm glad
13   for you to tell me where it is.  This is --
14   I'll add this to the list of the full chats
15   we want, or I'll hold the deposition open.
16   Q.   (By Mr. Moore)  So neither of us has any
17   idea, correct, Ms. Gates, of what's being referred to
18   here?
19   A.   Correct.
20   Q.   You then comment, "I'm restraining myself
21   from commenting #resisttheurge."
22       What did you mean?
23   A.   I don't know.
24   Q.   And then Danielle writes, "Wow Rothy's.  Way
25   to make a stab."

Page 167

1        Do you know what she means there?
2   A.   No.
3   Q.   And then a little bit further down, you say,
4   "@conning we were first #copycats."
5        What did you mean?
6   A.   I don't know.
7   Q.   Were you calling Rothy's copycats?
8   A.   I don't know what this is in reference to.
9   Q.   You see the date is March 25th, 2020?
10  A.   Yes.
11  Q.   And then below conning writes, "I know.
12  They are known for The Pointys."  Is that referring to
13  Rothy's?
14  A.   Again, I don't know.  I'd have to speculate.
15  Q.   Okay.  So you don't know if you were calling
16  Rothy's a copycat in March of 2020?
17  A.   I don't know.
18       MR. MOORE:   Counsel, again, I'd ask
19   for the full chat here.  Obviously we're
20   not able to do meaningful questioning
21   without it.
22       Let's go to the next exhibit, then,
23   which is 66.  And it is a document -- if
24   you'd please pull that up, just let me know
25   when you have it and have had a chance to

Page 168

1        look at it.  The document is Bates No.
2        BIRDIES_00065821.
3            (Plaintiff's Exhibit 66 was marked for
4        identification.)
5            THE WITNESS:   Okay.
6   Q.   (By Mr. Moore)  All right.  This is an
7   e-mail between you and Ms. Sharkey; correct?
8   A.   Correct.
9   Q.   And it's from 2015?
10  A.   Yes.
11  Q.   Your e-mail says, "Looks like they may be
12  competing with Tieks.  They just launched today," and
13  then you have a link to the Rothy's website; right?
14  A.   Yes.
15  Q.   What is Tieks?
16  A.   It's another ballet flat shoe company that's
17  digitally native, online only.
18  Q.   Do they use a knit upper?
19  A.   No.
20  Q.   Why did you think Rothy's was competing with
21  Tieks?
22  A.   Well, it was a foldable, bendable flat like
23  Tieks.
24  Q.   And Ms. Sharkey says, "Where did you hear
25  about them?  Super strange concept"; correct?

Page 169

1   A.   Yes.
2   Q.   Does that indicate that it's not something
3   that she had seen before?
4   A.   No.  I don't know what she was referring to
5   as the concept.
6   Q.   What did you think about the Rothy's concept
7   when you saw it in December of 2015?
8   A.   I don't remember.  That was many years ago.
9   Q.   You asked Ms. Sharkey to check out Rothy's
10  at that time; correct?
11  A.   Yes.
12  Q.   All right.  Let's continue the next exhibit,
13  No. 67.  Bates No. BIRDIES_00065827 through 65828.
14  Just let me know when you have that and have had a
15  chance to look, please.
16       (Plaintiff's Exhibit 67 was marked for
17       identification.)
18           THE WITNESS:   Okay.
19  Q.   (By Mr. Moore)  This is an e-mail from
20  April 2016, an e-mail exchange that you are on;
21  correct?
22  A.   Yes.
23  Q.   And it's with somebody named Brigid Parr
24  with Zapwater.  Who was that?
25  A.   Brigid was at -- Zapwater is our PR agency.

Page 198

1  asks Birdies to stop selling the knit Blackbird?
2      A.   I would have to read it again to know
3  exactly what it says.
4      Q.   All right.  Well, let me help you with that.
5  Do you see the third paragraph that reads -- that
6  begins by reading, "While we outline below the legal
7  bases for our demand that Birdies cease and desist the
8  sale of its knit loafer"?
9      A.   Uh-huh (affirmative).
10     Q.   Okay.  And do you see on Page 4 in the
11 second paragraph where the letter says, "Accordingly,
12 we demand that Birdies immediately and permanently
13 discontinue all advertising, promotion or sale of the
14 infringing product"?
15     A.   Uh-huh (affirmative).
16     Q.   All right.  Now, I take it Birdies has not
17 stopped selling the -- or stopped advertising,
18 promoting or selling the knit Blackbird as a result of
19 this letter; is that right?
20     A.   Well, we did not stop advertising, promotion
21 or sale of the -- of an infringing product, but our
22 Blackbird does not infringe.
23     Q.   Okay.  Let me try to ask this again.  After
24 receiving -- after receiving Exhibit 76, the cease and
25 desist letter, Birdies did not stop advertising,

Page 199

1  promoting or selling the knit Blackbird; correct?
2      A.   Correct.
3      Q.   All right.  Have you ever reviewed any of
4  the patents that Rothy's is asserting in this lawsuit?
5      A.   Only after they sent us the patent.
6      Q.   After you received this letter?
7      A.   Yep.
8      Q.   And did you review the patents at that time?
9      A.   I -- I reviewed this -- yes.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 200

1
2
3
4
5
6
7
8
9
10
11
12     Q.   All right.
13          If you could go to the next exhibit, please,
14 which is -- should be on the share site.  Let me know
15 when you have it, please.
16          (Plaintiff's Exhibit 77 was marked for
17      identification.)
18          THE WITNESS:  Which exhibit is it?
19     Q.   (By Mr. Moore)  Sorry.  I should say.  It's
20 Exhibit 77?
21          MR. MOORE:  And the Bates number, for
22      the record, is BIRDIES_00066574 through
23      66580.
24          THE WITNESS:  Okay.
25     Q.   (By Mr. Moore)  This is an e-mail from Ms.

Page 201

1  Grillo to you attaching -- with the subject "Rothy's
2  photos" from May of 2018; is that correct?
3      A.   Yes.
4      Q.   And is this the first e-mail in the chain
5  that we looked at earlier as Exhibit 70?
6      A.   It appears to be so.
7      Q.   Okay.  And do you see the photos that she
8  attached?
9      A.   Yes.
10     Q.   And those are photos of the wall in Rothy's'
11 store; correct?
12     A.   They appear to be, yes.
13     Q.   Is that -- do you know whether that's the
14 store in San Francisco?
15     A.   I'm not sure, but in looking at the shoes,
16 it says, "Heart SF" on one of them, so I would imagine
17 that's the San Francisco store.
18     Q.   Okay.  All right.  If you could please
19 download Exhibit 78.  Just let me know when you have
20 that.
21          (Plaintiff's Exhibit 78 was marked for
22      identification.)
23          THE WITNESS:  Okay.
24     Q.   (By Mr. Moore)  Okay.  This is a -- another
25 excerpt of Slack conversations between you and Ms.

Page 202

1    Sharkey; is that correct?
2        A.   Yes.
3        Q.   And I want to direct your attention to the
4    bottom of Page 7, which has a Bates No. 76863.  Just
5    let me know when you see that.
6        A.   Okay.
7             Okay.
8        Q.   There is a message -- two messages from Ms.
9    Sharkey to you on March 2nd, 2021; is that right?
10       A.   Yes.
11       Q.   And the first one is a link to the Rothy's
12   website; is that right?
13       A.   It's a link to their sales page on their
14   website.
15       Q.   What is their sales page?
16       A.   When they discount shoes, like they're
17   discounted.  There's a link to them doing a discounted
18   sale on their website.
19       Q.   And you've looked at that website before?
20       A.   Yes.
21       Q.   And then Ms. Sharkey says, "Lots of
22   learnings based on what is in here"; right?
23       A.   Yes.
24       Q.   Do you know whether you responded to that?
25       A.   I don't know.

Page 203

1        Q.   What type of learnings would you expect to
2    find from the Rothy's sale website?
3        A.   I don't know what she was referring to.
4             MR. MOORE:  Again, Counsel, we'd ask
5        for the full Slack messages here rather
6        than just reflected excerpts.
7        Q.   (By Mr. Moore)  And this -- this exchange of
8    messages in which Ms. Sharkey is sending a link to the
9    website of Rothy's, that's one week before the cease
10   and desist letter was received; is that right?
11       A.   Yes.
12       Q.   Okay.  And if you turn over two pages over,
13   Page 9, the top, do you see a -- your message that
14   says, "Hi, I'm free before 10:00 if you want to go to
15   cease" -- "go through cease and desist legal contract
16   together before responding"?
17       A.   Yes.
18       Q.   What does that refer to?
19            MR. TELLEKSON:  I'll caution you not
20       to disclose anything that would involve
21       discussion with counsel.
22            THE WITNESS:  I don't know if this is
23       referring to a call we were going to have
24       with our attorneys or what this is
25       referring to, but it was referring to the

Page 204

1        letter.
2        Q.   (By Mr. Moore)  The cease and desist letter?
3        A.   Yes.
4        Q.   You say, "My only callout is I don't think
5    we need to speculate on what they claim to, quote,
6    own.  We should wait for them to tell us."
7             What did you mean there?
8        A.   On the images, the patent images that I saw,
9    from my perspective, not as a legal eye, it was hard
10   to know what specifically the patents were referring
11   to.
12       Q.   And why was that hard for you to tell?
13       A.   Because it's a black-and-white photo and it
14   looked very different than our Blackbird, so I was
15   not -- I did not understand how we could possibly
16   infringe when our shoe looked very different to what I
17   was seeing in the patent.
18       Q.   Have you ever had any experience with
19   looking at design patents before you received the
20   cease -- cease and desist letter?
21       A.   No, never.
22       Q.   Do you have any under -- okay.
23            Do you have any understanding of the -- the
24   way drawings are done in design patents?
25       A.   I do not.

Page 205

1        Q.   Do you know, for example, what it means if
2    you have a solid line versus what it means if you have
3    a dotted line?
4        A.   No.
5        Q.   Okay.  From looking at the Rothy's patents,
6    did you see what you understood to be photographs or
7    drawings of a knitted material?
8        A.   I'd have to see them again to be sure, but
9    it was very hard for me to see -- to know what it was.
10   It's a grainy black-and-white image.
11       Q.   Okay.  Where did you get the patents from?
12       A.   From the cease and desist letter.
13       Q.   Did you actually -- right.  Okay.  No, I
14   understand there were some images from some of the
15   patents at least in the cease and desist letter; is
16   that right?
17       A.   I'd have to go back to look at the actual
18   letter, but I believe that was the first -- yes,
19   that's where I saw them.
20       Q.   Okay.  Let's pull that up again, please,
21   that cease and desist letter, which is Exhibit 76.
22       A.   Yes.
23       Q.   And -- all right.  And this is a
24   black-and-white copy of the letter; correct?
25       A.   Yes.

Page 210

1          (Plaintiff's Exhibit 79 was marked for
2     identification.)
3          THE WITNESS:  Okay.
4     Q.   (By Mr. Moore)  All right.  Do you recall
5  looking previously at the Slack messages in
6  Exhibit 56?
7     A.   I don't know specifically which ones --
8     Q.   All right.
9     A.   I don't -- I can pull out Exhibit 56.
10    Q.   Yeah, let me try to just expedite it.  What
11 I'm trying to do is see if we can confirm that
12 Exhibit 79 is the image that is included in the Slack
13 conversation in Exhibit 56.  So if you wouldn't mind
14 taking a look at that and let me know.
15    A.   Okay.  Oh, yes.
16    Q.   Okay.  So the image in 79 is the one that
17 was reproduced in Exhibit 56; is that right?
18    A.   Yes.
19    Q.   Okay.  If you'd look at Exhibit 80, please.
20         (Plaintiff's Exhibit 80 was marked for
21    identification.)
22         THE WITNESS:  Okay.
23    Q.   (By Mr. Moore)  Is this --
24         MR. MOORE:  And for the record, this
25    is a Slack chat excerpt with Bates number

Page 211

1          BIRDIES_00077204 through 77207.
2     Q.   (By Mr. Moore)  Looking on the fourth page
3  of four, is this the same Slack conversation that we
4  looked at in Exhibit 65?
5     A.   I'd have to look at Exhibit 65.  Let me
6  look.
7     Q.   Please do.
8     A.   Yes.
9     Q.   Can you tell from Exhibit 80 what prompted
10 this conversation?
11    A.   I don't know.
12    Q.   Megan says, "I saw this and literally
13 thought it was us."
14         Do you know what the "this" is?
15    A.   No.
16    Q.   Okay.
17         MR. MOORE:  Counsel, we'd renew that
18    request.  I know you tried to point us to
19    this document, but it doesn't satisfy our
20    previous request.
21         MR. TELLEKSON:  Counsel, you're
22    asking -- you're asking what someone else
23    meant.  It's not surprising that the
24    witness can't testify for someone else.  I
25    don't know what you're talking about.

Page 212

1         MR. MOORE:  David -- Counsel, what I'm
2    talking about is there is an image of
3    something that people are reacting to that
4    is in the Slack message that we can't see
5    because you-all have neglected to provide
6    all the images and truncated the
7    conversations arbitrarily.  This has been
8    the subject, as you put it, of copious
9    correspondence, and I understand you tried
10   to fix this but -- fix it by pointing us to
11   us -- to this document, but it doesn't fix
12   the problem.  So that's the issue.  We'll
13   deal with it offline.
14        If you permit more time dealing with
15   discovery deficiencies and less time
16   lecturing, we might not be in this problem.
17        Okay.  Why don't we take a break.
18   Five minutes?
19        MR. TELLEKSON:  Sure.
20        VIDEOGRAPHER:  The time is 4:00 p.m.
21   We're now off the record.
22        (A recess was taken.)
23        VIDEOGRAPHER:  The time is 4:15 p.m.
24   We're back on the record.
25   Q.   (By Mr. Moore)  Ms. Gates, I want to ask a

Page 213

1  few questions about the Blackbird.  For the knit
2  Blackbird, do you know what type of knit is used?
3     A.   I do not.
4     Q.   Do you know if it's a double knit?
5     A.   I do not.
6     Q.   Do you know, have you ever heard of a double
7  jacquard knit, J-A-C-Q-U-A-R-D?
8     A.   I have not.
9     Q.   You don't know if that's used in the knit
10 Blackbird?
11    A.   I do not.
12    Q.   Did anybody at Birdies decide on the
13 specific type of knitted material to use in the
14 Birdies' knit Blackbird?
15    A.   Robyn would know.
16    Q.   All right.  Now, I think we've covered one
17 difference between the original calf hair Blackbird
18 and the knit Blackbird is the former uses calf hair
19 for the upper, and the latter uses a knitted material;
20 correct?
21    A.   Yes.
22    Q.   The -- the knitted material in the knit
23 Blackbird, do you know what material that is?
24    A.   I thought I just said I don't know.
25    Q.   You don't -- you don't know what specific

Page 230

1   were to run out of the house in the middle of the
2   night with your shoes, it would be great that, you
3   know, you could throw them in the wash, clean them up,
4   and it's hard to do that with a velvet or a suede or a
5   leather.
6        Q.   Okay.  Is the knit used for the Blackbird in
7   the Judy's collaboration the same as the knit in the
8   other knit Blackbirds?
9        A.   I believe so.
10       Q.   And who was it that decided on the specific
11   knit that is used in the knit Blackbird?
12       A.   I don't recall.  I don't know.
13            MR. MOORE:  Okay.  I'm told that we
14       just got an e-mail with some additional
15       materials.  I think I'll need to take a
16       break and take a look at that and see what
17       to do.  Why don't we go off the record.
18            MR. TELLEKSON:  Sure.  That's fine.
19            VIDEOGRAPHER:  The time is 4:40 p.m.
20       We're now off the record.
21            (A recess was taken.)
22            VIDEOGRAPHER:  The time is 4:54 p.m.
23       We're back on the record.
24            MR. MOORE:  Okay.  We've just received
25       in the last 20 minutes or so a couple of

Page 231

1        e-mails from Birdies' counsel with some of
2        the screenshots we had requested.
3        Q.   (By Mr. Moore)  Ms. Gates, do you have in
4   front of you or can you pull up, please, Exhibit 54.
5        A.   Okay.  It's up.
6        Q.   And this is a Slack message between you and
7   Ms. Longley from February 9th of 2021; correct?
8        A.   Yes.
9            MR. MOORE:  Okay.  Now, I would ask
10       Ms. Moore to please share what we will mark
11       as Exhibit 1 [sic], which is two JPEG files
12       that we just received from Birdies'
13       counsel.
14            (Plaintiff's Exhibit 81-1 and 81-2
15            were marked for identification.)
16       Q.   (By Mr. Moore)  All right.  If you look at
17   Exhibit 54, on the third page, do you see the message
18   from Ms. Longley that says, "Hi Bianca, is the
19   following an appropriate way to address comments
20   comparing us to Rothy's?"
21            Are you still there?
22       A.   Yes.  Sorry.  I'm just reading it.  Yeah.
23       Q.   Oh, it's on the big screen.  Okay.  You just
24   disappeared.
25       A.   Yes.  Oh.  Sorry.  Here.

Page 232

1        Q.   It's okay.
2        A.   I'm having trouble reading it.
3        Q.   It's fine.  It's fine.  If you need to walk
4   over there and read it, go ahead.
5        A.   Okay.
6        Q.   All right.  And so what we've marked as the
7   first image in Exhibit 81, is that the screenshot that
8   Ms. Longley sent you when she asked whether her
9   response was the -- was an appropriate way to address
10   comments comparing the knit Blackbird to Rothy's?
11       A.   Yes.
12       Q.   And this is the comment in her initial
13   proposed response to Courtney Woodard Lewis on
14   Facebook on February 9th; correct?
15       A.   Correct.
16       Q.   All right.  If you'd scroll down a little
17   bit further on Exhibit 54 to the next page, Page 4, do
18   you see that you have a message from -- that says,
19   "Hi.  I think this needs to be edited.  Do you know if
20   she's a customer?"
21       A.   Yes.
22       Q.   And then you have a -- an image file
23   directly below that?
24       A.   Yes.
25            MR. MOORE:  Could you go to the next

Page 233

1        image in Exhibit 81, please, Ms. Moore.
2        There we go.  Can you blow that up any?
3            THE WITNESS:  I'm going to walk up to
4        the screen again.  It's very small.
5        Q.   (By Mr. Moore)  Go ahead.
6            My question will be is what's shown here on
7   the second image of Exhibit 81 the screenshot that you
8   sent to Ms. Longley when you told her that it needed
9   to be edited?
10       A.   Yes.
11       Q.   And that is the Instagram post from
12   kelseizetheday; right?
13       A.   Yes.
14       Q.   Okay.  Next, I'd like to go back, and if you
15   would please pull up Exhibit 62.  Let me know when you
16   have it.
17       A.   Okay.
18       Q.   This is a Slack chat between you and Ms.
19   Nasser about filming the video of the knit Blackbird a
20   couple of weeks before it's released; correct?
21       A.   Correct.
22            MR. MOORE:  I'd like -- we're going to
23       mark as Exhibit 82 one of the JPEG files we
24       just received.  I'll ask Ms. Moore to
25       please show that.

Page 234

1       (Plaintiff's Exhibit 82 was marked for
2      identification.)
3    Q.  (By Mr. Moore)  If you go to the bottom of
4  Exhibit 62, you see the last two messages, one is a --
5  a hyperlink to a file, and the last is you saying,
6  "Oh, my God."
7    A.  Yes.
8    Q.  All right.  Is the image that's being shown
9  on Exhibit 82 on the screen the screenshot that Ms.
10  Nasser sent you?
11    A.  I believe so, yes.
12    Q.  And I have that right, it's Ms. Nasser;
13  right?
14    A.  Correct.
15    Q.  Or as you call her, CK?
16    A.  She's CK.  Yep.
17    Q.  All right.  Great -- or no, CQ; right?
18    A.  Well --
19    Q.  Well --
20    A.  This is why it got confusing.  They're both
21  Jacqueline, but one goes by Jackie, and the other one
22  goes by Jacqueline.  And so it just became easier CK,
23  CQ.  But their both names are Jacqueline.
24    Q.  I see that on the screenshot, it's Jackie,
25  and on the Exhibit 62, it's Jacqueline.  But she is

Page 235

1  CK; all right?  Is that right?
2    A.  CK, yes.
3    Q.  Great.  Last, if you could go back, please,
4  to Exhibit 78.
5    A.  Okay.
6    Q.  And if you scroll to -- let's see where this
7  is.  I'm trying to find the image.
8       MR. MOORE:  We're having a little
9    trouble finding the right image, but if we
10    could go ahead and mark and display
11    Exhibit 83, Ms. Moore.
12       (Plaintiff's Exhibit 83 was marked for
13    identification.)
14       THE WITNESS:  I'm going to come up to
15    the screen and read it.  It's very small.
16    Q.  (By Mr. Moore)  Please.
17    A.  It's hard to read what this is, to be
18  honest.
19    Q.  Yes.  There's a message in which you write,
20  "Thanks.  Just another reminder that Rothy's is coming
21  up with BS for the sake of it"; correct?
22    A.  Right.  I can read that.  What I'm referring
23  to is the document.
24    Q.  Right.  And you can't -- you -- you can't
25  read the actual document because it's too blurry?

Page 236

1    A.  Yes, or my eyes are bad.
2    Q.  Well, mine -- mine aren't great either, but
3  I think it may be the image.  But in any event, is
4  that the screenshots that you sent to Ms. Sharkey when
5  you made that comment?
6    A.  I -- I suppose so.
7    Q.  Okay.  If you go to Page 15 of Exhibit 78 at
8  Bates No. 76871.  About halfway down the page,
9  there's -- you see the comment, "Thanks, just another
10  reminder that Rothy's is coming up with BS for the
11  sake of it"?
12    A.  I'm sorry, on Page 15?
13    Q.  Yes.  The PDF Page 15 of Exhibit 78.
14    A.  Oh.  Right.  Okay.
15    Q.  Do you see that message?
16    A.  Yes.
17    Q.  All right.  And then below that, you see an
18  image file referenced?
19    A.  Yes.
20    Q.  And is that the -- the image -- is what we
21  see in Exhibit 83 that's on the screen the image that
22  you attached there?
23    A.  I don't -- I don't know.  I guess so.
24    Q.  Okay.  Why did you consider that to be
25  Rothy's coming up with BS?

Page 237

1    A.  I don't remember what I was thinking, and
2  I -- I -- it's unclear what this document is or what I
3  was thinking at the time.  I don't know.
4    Q.  Okay.  I assume you're using BS in the
5  normal colloquial sense there.
6    A.  Perhaps.
7    Q.  Okay.  All right.
8       MR. MOORE:  I don't have any further
9    questions for you at this time.  I would
10    reserve the right, just because we've
11    gotten so much material, to re-call Ms.
12    Gates based on belated production.
13    I understand you don't agree with
14    that, but I think we can agree that for
15    today, that will conclude my questioning of
16    this witness.
17    Thank you very much for your time, Ms.
18    Gates.
19       MR. TELLEKSON:  And I have no
20    questions for this witness.  Thank you very
21    much.
22       MR. MOORE:  All right.  We can go off
23    the record.
24       VIDEOGRAPHER:  This is the end of
25    Media 3.  The time is 5:06 p.m.  We're now

**ROTHY'S, INC. vs BIRDIES, INC.**
**Bianca Gates on 02/11/2022**

Attorneys Eyes Only                                                                 Pages 238..241

**Page 238**

1    off the record.

2         (Deposition concluded at 5:06 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 240**

1    STATE OF GEORGIA:

2    COUNTY OF FULTON:

3

4         I hereby certify that the foregoing

5    transcript was reported, as stated in the

6    caption, and the questions and answers

7    thereto were reduced to typewriting under

8    my direction; that the foregoing pages

9    represent a true, complete, and correct

10   transcript of the evidence given upon said

11   hearing, and I further certify that I am

12   not of kin or counsel to the parties in the

13   case; am not in the employ of counsel for

14   any of said parties; nor am I in any way

15   interested in the result of said case.

16

17

18                   _Blanche J. Dugas_

19

20             BLANCHE J. DUGAS, CCR-B-2290

21

22

23

24

25

**Page 239**

1
2                  DISCLOSURE

3         Pursuant to Article 10.B of the Rules
     and Regulations of the Board of Court
     Reporting of the Judicial Council of
4    Georgia which states:  "Each court reporter
     shall tender a disclosure form at the time
5    of the taking of the deposition stating the
     arrangements made for the reporting
6    services of the certified court reporter,
     by the certified court reporter, the court
7    reporter's employer or the referral source
     for the deposition, with any party to the
8    litigation, counsel to the parties, or
     other entity.  Such form shall be attached
9    to the deposition transcript," I make the
     following disclosure:
10
         I am a Georgia Certified Court
11   Reporter.  I am here as a representative of
     Huseby Global Litigation.  Huseby Global
12   Litigation was contacted to provide court
     reporting services for the deposition.
13   Huseby Global Litigation will not be taking
     this deposition under any contract that is
14   prohibited by O.C.G.A. 9-11-28(c).
15       Huseby Global Litigation has no
     contract/agreement to provide reporting
16   services with any party to the case, any
     counsel in the case, or any reporter or
17   reporting agency from whom a referral might
     have been made to cover this deposition.
18
         Huseby Global Litigation will charge
19   its usual and customary rates to all
     parties in the case, and a financial
20   discount will not be given to any party to
     this litigation.
21                   _Blanche J. Dugas_
22
                     Blanche J. Dugas
23                   CCR No. B-2290
24
25

**Page 241**

1                   CAPTION

2

3         The Deposition of BIANCA GATES, taken in

4    the matter, on the date, and at the time and place set

5    out on the title page hereof.

6         It was requested that the deposition be

7    taken by the reporter and that same be reduced to

8    typewritten form.

9         It was agreed by and between counsel and

10   the parties that the Deponent will read and sign the

11   transcript of said deposition.

12

13

14

15

16

17

18

19

20

21

22

23

24

25