UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROTHY'S, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>BIRDIES, INC.,<br><br>          Defendant. | Case No. 21-cv-02438-VC<br><br>**ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 67 |

      This is a patent dispute about shoes. Rothy's has obtained design patents for some of its women's loafers. A prominent aspect of the patents is the knitted design of those loafers. Another company, Birdies, began selling a knitted women's loafer after Rothy's received its patent protection. Rothy's has now sued Birdies for patent infringement. In this early summary judgment motion, Birdies argues primarily that the patented designs are obvious, and therefore invalid, due to the presence of prior art. In describing the prior art, Birdies points primarily to its own women's loafer marketed before Rothy's obtained the patents. That loafer is made of calf hair and does not have a knitted design.

      Birdies is not entitled to summary judgment on invalidity. A reasonable jury could easily conclude that the calf hair loafer is not a primary prior art reference that could (when combined with other prior art) render Rothy's design patents obvious. Birdies has also moved for summary judgment on the issue of infringement, but that motion must be denied as well, notwithstanding the Court's skepticism about Rothy's ability to win on infringement at trial.

I

San Francisco-based Rothy's manufactures and sells a variety of men's and women's

shoes that it markets as both stylish and environmentally sustainable. Rothy's launched in 2012 and has since built a devoted fan base of consumers who appreciate the company for its eco-friendly model. Some articles promoting the brand tout that Meghan Markle, the Duchess of Sussex, has been spotted sporting Rothy's flats. Birdies, another San Francisco-based footwear company, was launched three years after Rothy's was founded. Birdies sells women's loafers suitable for entertaining at home. Founded by two "busy moms," Birdies' shoes are designed to be "fashionable and luxurious," yet still comfortable. Birdies also cites Meghan Markle's decision to wear its shoes as a key milestone on its path to popularity.[1]

Birdies launched its "Blackbird" shoe at the tail end of 2015. The original Blackbird is a flat women's loafer (the company also describes it as a "slipper") made of black calf hair, with a soft padded inside. About a year and a half after the Blackbird's launch, Rothy's applied for and secured the patents at issue in this case. Those patents—described in more detail below with accompanying images—claim designs for loafers with a knitted appearance. Rothy's sells shoes that practice some of those patents, including its Loafer and Pointed Loafer shoes.

In 2021, after Rothy's secured its patents, Birdies introduced a new Blackbird design, this time in a knitted material. Rothy's now claims that Birdies' knitted Blackbird infringes on its design patents, specifically United States Design Patent Nos. D885,016, D885,017, D870,425, D909,718, and D925,874.

Birdies has filed an early motion for summary judgment, arguing primarily that the patents are invalid. In Birdies' view, the patents are obvious, based (in large part) on Birdies' preexisting original Blackbird shoe that was made of calf hair. Birdies also argues that one of Rothy's patents fails to claim a specific material and is therefore invalid as anticipated. Alternatively, Birdies argues that even if Rothy's patents are valid, Birdies' knitted Blackbird shoe does not infringe as a matter of law.

---

[1] It should already be obvious that the Duchess will need to serve as a witness in this case.

II

A

Design patents may be secured for "any new, original and ornamental design for an article of manufacture." 35 U.S.C. § 171(a). Like other patents, they may be invalidated "if the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious." *Id.* § 103. Patents "shall be presumed valid." *Id.* § 282(a). A defendant seeking to overcome that presumption must show, by clear and convincing evidence, that a patent is invalid. *Microsoft Corp. v. i4i Limited Partnership*, 564 U.S. 91, 102 (2011). On summary judgment, therefore, it falls on the moving party to show that any reasonable jury would be compelled to find invalidity by clear and convincing evidence. *Spigen Korea Co., Ltd. v. Ultraproof, Inc.*, 955 F.3d 1379, 1383–84 (Fed. Cir. 2020) ("[I]f based on the evidence, a reasonable jury *could* find in favor of the non-moving party, a trial court must stay its hand and deny summary judgment of obviousness.").

In design patent cases, obviousness turns on "whether the claimed design would have been obvious to a designer of ordinary skill who designs articles of the type involved." *Durling v. Spectrum Furniture Co., Inc.*, 101 F.3d 100, 103 (Fed. Cir. 1996). Put differently, if a designer of "ordinary skill would have combined teachings of the prior art to create the same overall visual appearance as the claimed design," then the patent is obvious. *Id.*

The inquiry demands that a court first identify a primary reference—that is, "something in existence, the design characteristics of which are basically the same as the claimed design." *In re Rosen*, 673 F.2d 388, 391 (C.C.P.A. 1982); *see also Apple, Inc. v. Samsung Electronics Co., Ltd.*, 678 F.3d 1314, 1331 (Fed. Cir. 2012). After identifying a primary reference, "other references may be used to modify it to create a design" that gives off the same visual appearance as the patented design. *Durling*, 101 F.3d at 103. Summary judgment is appropriate where "the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors." *KSR International Co. v. Teleflex Inc.*, 550 U.S. 398, 427 (2007).

Birdies identifies the original Blackbird shoe as the "primary reference." But a jury would not be compelled to conclude that the original Blackbird shoe is "basically the same" as the designs claimed in the patents. This is so for a simple reason: The original Blackbird is made of calf hair, rather than knitted material. Rothy's patents all claim a loafer with a knitted appearance. Patent '016, which claims an "ornamental design for a shoe, as shown and described," includes as its first figure the image below:



The material on the main body of the loafer (rather than the toe section) is illustrated using thin sold lines that intersect in a dense, grid-like structure. That material appears to depict stitching consistent with knit. The patent's stated description confirms as much, explaining that the "figures include textured portions, which is [sic] designed to show a stitched fabric of the design." The '017 patent is similar, using the same dense intersecting solid lines to showcase what appears to be knitted material. Like the '016 patent, it too claims "[t]he ornamental design for a shoe, as shown and described," and includes as its first figure the image below:



As with the '016 patent, the '017 patent above uses a visually similar illustration of thin intersecting lines, forming a dense grid that appears to represent knit. Rothy's other patents are more explicit, depicting knitted fabric stitching directly by using a photograph of the material. For instance, the '425 patent claims "[t]he ornamental design for a portion of a shoe, as shown and described," and includes as its first figure the "embodiment" of the design:



The '425 patent's first figure maps a photograph of stitched knitted material onto the claimed body of the shoe. The same goes for both the '718 and '874 patents. Similar to the other three Rothy's patents, each claims "[t]he ornamental design for a shoe, as shown and described." And each depicts a loafer with a shape similar to those above, with an image of stitched knit material mapped onto the body of the shoe. Each of Rothy's five patents, in short, claims a loafer having a knitted appearance.

This is in contrast to the Birdies original Blackbird shoe made of calf hair:



Putting to the side any similarities in shape or the shoe's physical structure, a jury could easily conclude that the calf hair material does not give off "basically the same visual impression" as the knitted material claimed in Rothy's patents. *Durling*, 101 F.3d at 103. The Court's view is buttressed by its physical examination of the original Blackbird shoe, a pair of which the parties lodged as an exhibit. Words alone cannot adequately convey what the eye perceives. Suffice it to say that a jury could easily conclude that hair and knit convey different visual impressions and that the original Blackbird therefore could not serve as a primary reference.

To be sure, the original Blackbird shares a visually similar structure and silhouette with the loafer designs claimed in Rothy's patents. As explored more fully below in the context of infringement, the Blackbird and Rothy's patented loafers each contain several features that visually align the designs. But when it comes to assessing obviousness, it is "not only the individual elements, but the ornamental quality of the combination" that "must be suggested in the prior art." *L.A. Gear, Inc. v. Thom McAn Shoe Co.*, 988 F.2d 1117, 1124 (Fed. Cir. 1993). In this context, a jury could find that the fabric looms large. *See MRC Innovations, Inc. v. Hunter Manufacturing, LLP*, 747 F.3d 1326, 1332–33 (Fed. Cir. 2014) (examining similarities in "fabric" to find obviousness); *Zidell v. Dexter*, 262 F. 145, 147 (9th Cir. 1920) ("In determining the question of infringement, both the character of the design and the nature of the fabric to

which it is applied are to be taken into account.").[2]

Nor has Birdies surfaced any other shoe that could serve as a primary reference. Birdies moved for summary judgment by identifying the original Blackbird as its primary reference, and not by pointing to any other shoe. But even if one of the secondary references Birdies identified were treated as a potential primary reference, the outcome here would not change. No secondary reference shoe identified in Birdies' motion gives off a visual impression that would require any reasonable jury to conclude that it is "basically the same" as the Rothy's patented designs.

B

Birdies separately argues that Rothy's '017 patent is invalid as anticipated. Like obviousness, anticipation renders a patent invalid. Anticipation occurs where "the claimed invention was . . . described in a printed publication . . . or otherwise available to the public before the effective filing date of the claimed invention." 35 U.S.C. § 102(a)(1). When it comes to design patents, anticipation "requires a showing that a single prior art reference is identical in all material respects to the claimed invention." *Door-Master Corp. v. Yorktowne, Inc.*, 256 F.3d 1308, 1312 (Fed. Cir. 2001) (quotations and citation omitted). Put differently, if the preexisting article would infringe the patent, then the patent is anticipated. *See Peters v. Active Manufacturing Co.*, 129 U.S. 530, 537 (1889).

The original Blackbird does not anticipate Rothy's '017 patent for the same reason as it cannot serve as a primary reference on summary judgment. Because the original Blackbird is made of calf hair, it is not so "identical in all material respects" to the claimed knitted loafer depicted in the '017 patent that no reasonable jury could conclude otherwise.

In Birdies' view, the '017 patent does not claim a knitted appearance. Birdies turns for support to the '016 patent's description, which explains that the "textured portions" depicted in

---

[2] The Court expressed skepticism at the summary judgment hearing about whether Birdies could even be permitted, as a matter of law, to present the original Blackbird to the jury as a primary reference. But having reviewed again the Federal Circuit's decision in *MRC Innovations*, the Court is now of the view that Birdies is entitled to put the question to a jury. That does not change the answer here—perhaps a jury will accept the original Blackbird as a primary reference, but Birdies has not come close to establishing that any reasonable jury would do so.

the drawings are "designed to show a stitched fabric." Because the '017 patent fails to include similar language, Birdies says the '017 patent does not claim a knit appearance. But the visual appearance of the intersecting lines in the '017 patent still connotes a knit material. Rothy's failure to include a similar written description does not change the visual appearance of the design claimed in the '017 patent.

III

The next question is whether a reasonable jury could find that Birdies' knitted Blackbird shoe infringes Rothy's patents. A design need not be found "identical" to infringe. *Braun Inc. v. Dynamics Corporation of America*, 975 F.2d 815, 820 (Fed. Cir. 1992). Infringement instead occurs "if, in the eye of an ordinary observer, giving such attention as a purchaser usually gives, two designs are substantially the same, if the resemblance is such as to deceive such an observer, inducing him to purchase one supposing it to be the other." *Gorham Manufacturing Co. v. White*, 81 U.S. 511, 528 (1871). While the obviousness inquiry hinges on a hypothetical ordinary designer, the infringement inquiry turns to an ordinary observer. The ordinary observer test, while practical, cannot be conducted in a vacuum. It must instead be applied within the context of prior art. *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 676–78 (Fed. Cir. 2008) (en banc). Where there are "numerous similar prior art designs, those designs can highlight the distinctions between the claimed design and the accused design." *Id.* at 677.

The Federal Circuit cautions that, when it comes to design patents, district courts need not "provide a detailed verbal description of the claimed design, as is typically done in the case of utility patents." *Id.* at 679. Heeding that instruction, this Court "is generally persuaded that the ordinary observer test must be applied based upon the overall visual impression of the claimed designs and will avoid a detailed written claim construction describing various elements of the claimed designs." *Apple, Inc. v. Samsung Electronics Co., Ltd.*, 2012 WL 3071477, at *2 (N.D. Cal. July 27, 2012). Rothy's patents are therefore construed consistent with the visual depictions provided in each respective patent. Patent '016 claims the body (not the toe section) of a loafer

"within the solid lines and inside the dash-dot-dash lines," as shown in Figures 1–7.[3] Patent '017 claims the design of a loafer within the solid lines, as shown in Figures 1–7. Patent '425 claims the body (not the toe section) of a loafer within the solid and dash-dot-dash lines as depicted in Figures 1–14.[4] Patent '718 claims the design of a loafer within the solid lines, as shown in Figures 1–14. And patent '874 claims the front portion (not the heel) of a loafer within the dashed lines as shown in Figures 1–7.

A jury could reasonably find that Birdies' knitted Blackbird, depicted below, infringes each of Rothy's patents.



| Rothy's '718 Patent | Birdies' Knit Blackbird |

Taking the '718 patent as an example, a jury could conclude that the knitted Blackbird

---

[3] The figures do not use lines consistently. For instance, Figure 4 uses a solid line to form a boundary along the base of the shoe, whereas Figure 1 uses a dashed line in the same place. The Court construes the patent as disclaiming the toe portion of the shoe, demarcated with a dash-dot-dash line that crosses the main body of the shoe (the toe portion is shaded differently, too). The main body of the shoe—illustrated using crisscrossing lines—forms the claimed portion of the patented design.

[4] The '425 patent includes indecipherable and contradictory language as to which exact portions of the design are claimed: "The figures include broken, solid and dash-dot-dash lines. The areas within the solid lines, inside the dash-dot-dash lines and inside the broken lines form the claimed design. The broken lines shown in the figures are included for the purpose of illustrating portions of the portion of a shoe and form no part of the claimed design." That description could be read to mean that the portions inside the broken lines are claimed. But the better interpretation given the full description and the drawings is that only the portions contained within the solid and dash-dot-dash lines are claimed.

gives the same overall visual impression as the claimed design. The Blackbird and the design claimed in the '718 patent have a similar silhouette. Birdies even admits as much by arguing that the *original* Blackbird—made of calf hair—and the Rothy's patented designs share a silhouette. The '718 patent and the knitted Blackbird both have a knitted fabric appearance. Both shoes have an elongated body with a pointed toe. Both exhibit similar-sized gussets (small inlets near the tongue) and a similar toe spring (the gap between the tip of the toe and the surface upon which the shoe sits). Both shoes share a similar elongated vamp—the top portion of the shoe that conceals (or shows) the wearer's foot. Viewed as a whole, a reasonable jury could find that an ordinary consumer who purchases loafers like these might be confused between Birdies' knitted Blackbird and the design claimed in the '718 patent.

The same goes for the other four patents. The '016 and '425 patents each claim the body of a knitted loafer (and not the toe region) that resembles the knitted Blackbird. The '017 patent, like the '718 patent, claims the full body of a knitted shoe and, again, appears visually similar to the knitted Blackbird. And the '874 patent, which claims only the front portion of a knitted loafer (and not the heel region), likewise gives off a similar visual impression as the knitted Blackbird.

Expert testimony bolsters the point. Rothy's offers the expert opinion of Caroline de Baere, an independent consultant in the footwear industry with design experience. Her declaration counts only marginally when it comes to the ordinary observer analysis. That is because, as the Supreme Court long-ago decided, what matters is not the view of an expert's trained eye—design infringement instead turns on whether an *ordinary* observer would be confused by visual similarities between designs. *See Gorham Manufacturing*, 81 U.S. at 528. Still, de Baere's analysis highlights visual similarities between the knitted Blackbird and Rothy's patents that shed some light on how an ordinary observer might perceive the various designs. Her conclusion that an ordinary observer would be confused by the visual similarities between the designs and Birdies' knitted Blackbird adds at least some weight to the finding that a reasonable jury could conclude the same. Birdies, for its part, offers no meaningful rebuttal to de Baere's analysis.

Although a reasonable jury could conclude that the knitted Blackbird infringes, it remains a close question—closer than the question whether Rothy's patents are invalid as obvious. The infringement analysis is complicated by the reality that the loafer market is well-developed, with a long history and myriad iterations of prior art. "[W]here in a crowded art the composite of differences presents a different impression to the eye of the average observer[,] . . . infringement will not be found." *Applied Arts Corp. v. Grand Rapids Metalcraft Corp.*, 67 F.2d 428, 430 (6th Cir. 1933). Even when trained to the overall visual impression, differences between designs, "viewed in light of the prior art," can draw "the attention of the hypothetical ordinary observer . . . to those aspects of the claimed design that differ from the prior art." *Crocs, Inc. v. International Trade Commission*, 598 F.3d 1294, 1303 (Fed. Cir. 2010).

An ordinary observer carefully attuned to the vast prior art of loafers may well identify critical differences between the knitted Blackbird and Rothy's patented designs. For instance, the knitted Blackbird's gussets appear shallower and less defined than those claimed in the patents. The '016, '017, '425, and '718 patents each claim a raised heel counter (the very back portion of the heel). But the knitted Blackbird's vamp runs flat through the heel and does not exhibit the same raised portion toward the back of the shoe. The knitted Blackbird's toe point counts as another distinction: It appears slightly less angled than the toe point claimed in the patented designs. Taken together, these distinctions may well be enough to dispel any visual similarities between the designs. Indeed, Rothy's appears to have an uphill trial battle on its hands when it comes to infringement.

But this is summary judgment, and Birdies cannot win on infringement at this stage. For one thing, "[i]n evaluating a claim of design patent infringement, a trier of fact must consider the ornamental aspects of the design as a whole and not merely isolated portions of the patented design." *Braun*, 975 F.2d at 820. Although a careful eye could train on several differences between the knitted Blackbird and the patents, those elements must be viewed in context. More fundamentally, infringement—it bears repeating—does not require designs that prove "identical" to one another. *Id.* Rothy's patents and the knitted Blackbird convey visual impressions similar

enough that a reasonable jury could find them "substantially the same," even accounting for the prior art. *Gorham Manufacturing*, 81 U.S. at 528.

Birdies argues that Rothy's cannot have it both ways. How can the Blackbird shoe resemble Rothy's patents closely enough that a jury could find infringement, but not so closely that Birdies' original Blackbird shoe does not render Rothy's patents invalid due to obviousness? The knitted appearance claimed in Rothy's patents explains why. Because the original Blackbird shoe uses calf hair, rather than knit, a reasonable jury could find that it fails as a primary reference. But because the knitted Blackbird uses a material visually akin to the material claimed in Rothy's patents, that same reasonable jury could find infringement.

Birdies highlights one additional difference between the shoes not yet discussed. In its view, each of the patents claims a particular color such that the knitted Blackbird, by using different colors, does not infringe as a matter of law. Birdies argues that the '016 patent claims a color contrast between the (unclaimed) toe portion and the rest of the shoe. But that cannot be right given that the toe portion is just that: unclaimed. The same response addresses Birdies' arguments about the '425 and '874 patents, each of which includes drawings showing dark fabric and white space where the unclaimed toe and heel portions would appear. But as with the '016 patent, the unclaimed portions of the '425 and '874 patents do not mean the designs claim a color contrast. Birdies argues that the '017 patent claims a single color. But the patent itself claims no color at all—it consists of intersecting lines forming a grid, suggesting that any color might be used.

As for the '718 patent, Birdies argues that because Rothy's used black fabric to represent the knit appearance, the design necessarily claims a black color. It cites 37 C.F.R. § 1.152, which provides that "[s]olid black surface shading is not permitted except when used to represent the color black as well as color contrast." The '718 patent does not, however, use solid black surface shading to represent a color. It instead uses a photograph of black knitted material to convey a knit appearance.

IV

Birdies has not established as a matter of law that Rothy's patents are invalid. Nor has it done enough, on this record, to demonstrate noninfringement as a matter of law. Accordingly, the motion for summary judgment is denied.

**IT IS SO ORDERED.**

Dated: May 9, 2022

_____
VINCE CHHABRIA
United States District Judge